[Crim. No. 7019. Third Dist. Mar. 15, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT SPENCER WORTHINGTON, Defendant and Appellant.

## COUNSEL

Ronald E. Moe, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, and Marjory Winston Parker, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**THOMPSON, J.**\*—Defendant herein was charged with two counts of murder and four prior felony convictions. Defendant entered pleas of not guilty to the murder counts and admitted the four prior convictions. He was convicted by the jury of two counts of first degree murder.

In this appeal defendant asserts three contentions, namely:

1. Allowing the testimony of defendant's wife, over his claim of privilege, constituted prejudicial error.

2. The trial court committed prejudicial error in refusing to exclude the testimony of Dr. Rooney and Thomas Eddy.

3. The trial court committed prejudicial error in allowing the testimony of Barbara Eddy.

4. The trial court committed prejudicial error in instructing on first degree felony murder.

We shall endeavor to give an overview summary of the evidence preliminarily, with a more detailed discussion of the evidence as it relates to the particular contentions of error being asserted.

---

\*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

On December 4, 1972, in the early morning hours a neighbor of the murdered victims was awakened by a mentally retarded child (unable to communicate intelligibly) of Mrs. Smith, one of the victims, and was made aware of some unusual happening in the Smith home. Upon his entry into the Smith home he discovered the bodies of Mrs. Smith and her 11-year-old daughter Peggy. He immediately called the sheriff's office. Briefly, their investigation disclosed that both victims had died of massive skull fractures, apparently caused by a blunt instrument such as a large wrench. Other injuries apparently caused by being struck with a fist were found on Mrs. Smith. Subsequent investigation disclosed the presence of chloroform in the blood of Peggy. Many spots of blood of varying sizes were found, some on the walls, on the carpet, a table, a window sill, a towel apparently used to wipe up blood, a bloody footprint on the carpet.

Defendant and his wife Irene had been living in the Smith home until approximately two weeks before the murders. Intense friction had developed between Mrs. Smith and Mrs. Worthington, defendant's wife, and as a result thereof the Worthingtons moved into the home of Ted and Maxine Brazell where they were living on December 4, 1972.

On the night of December 3d, defendant and Irene returned to the Brazell house at about 1:30 in the morning. Irene was in a high state of intoxication and passed out on the front room couch which was their customary sleeping place. Mr. Brazell asked defendant to go out and buy some cough medicine for Mrs. Brazell, which mission proved fruitless since no drug stores were open at that hour of the night. The Brazells retired for the night, leaving defendant watching television.

Irene testified that she was awakened by her husband in the very early morning hours of December 4th, at which time she observed him holding some clothing including a pair of black shoes which had been issued to him on his recent release from Deuel Vocational Institution at Tracy. Defendant indicated that he wished to go somewhere and Irene got ready to leave with him. He left the house five minutes before Irene still carrying the clothes and shoes, but when she went outside he no longer had them with him.

Upon entering their car, a white Rambler station wagon, defendant told his wife he had done something and he was taking her to the Eddys', his relatives, and he would send for her later. He drove near the Smith home and remarked that the lights were still on in the residence. Upon arriving at the Eddys' house, they did not go in for some time. Defendant then told his wife he had killed Mrs. Smith and Peggy because they were talking about her (Irene). He stated he had killed them with a wrench, and that

he had thrown the wrench in the levee. Irene's response to this information was that it would be better for her to stay with him as it would look suspicious if they parted.

Defendant then indicated that he wanted to wash some clothes. Irene noted that he had placed in the back seat of the car the clothes he had been seen carrying. They then proceeded to wash the clothes in an all-night laundromat. Irene observed blood spattered on the shirt that was being washed.

The washing accomplished, they returned to the Brazell home at about 4:30 a.m and went to sleep. Upon awakening, they went to visit Irene's aunt Mrs. Sherman. During the visit Mrs. Sherman's daughter called to reassure her mother that she was safe, and that she was not one of the murder victims whose deaths were being reported on newscasts. Defendant asked to watch the news on television and when Mrs. Sherman's daughter came to visit her mother, defendant appeared to show an intense interest in the details of the murder and if the "man" (murderer) had been described in the newscast.

On the evening of the 4th, defendant's parole officer requested him to come to his office. Defendant did so, and on the way told his wife and the Brazells who were accompanying him to tell the parole officer that he had not left the house all night. Two police officers were waiting at the parole office and took both the Brazells and the Worthingtons to the police station, and although no one was arrested, the Worthington car was impounded. The vehicle was closely examined and blood of the same type as Mrs. Smith (type A) was found on the steering wheel. Other blood in amounts too small to classify was found on a flashlight in the vehicle and on the exterior of the car on the driver's side. The floorboard on the driver's side was clean and wet while the remainder of the interior of the car was littered and dirty. After defendant's arrest, he gave two rings to his wife which were taken from her and examined and traces of blood were found. One of the car keys taken from defendant was also found to have a minute trace of blood.

About five weeks later a shoe, identified as belonging to defendant, was found in a backyard near the murder scene, which shoe was found to compare with the footprint on the bloody carpet at the murder scene and was found also to have blood imbedded in a nail hole.

Several witnesses testified as to threats made upon the life of the deceased, Mrs. Smith, such threats emanating both from defendant and his wife.

We shall discuss other aspects of the evidence as they relate particularly to the defenses asserted by defendant.

■ Defendant's first assertion of error is that the court committed prejudicial error in permitting defendant's wife to relate a confession made to her by defendant concerning his commission of the murder. To place this confession in its proper perspective, we must note that Officer Wilson (out of the jury's presence) testified that defendant had volunteered to him that it was his wife who had killed the victims and described in detail how the killings had taken place, an account which was for all purposes a recital of the wife's recital to the police of how her husband had killed his victims but with their roles reversed. After the receipt of considerable evidence and argument, the court ruled that defendant had irrevocably waived the right to claim the husband-wife privilege.

Evidence Code section 980 provides: "[A] spouse . . . whether or not a party, has a privilege during the marital relationship and afterwards to refuse to disclose, and to prevent another from disclosing, a communication if he claims the privilege and the communication was made in confidence between him and the other spouse while they were husband and wife."

The above-quoted section is made subject specifically to the provisions of Evidence Code section 912, which reads in its applicable portion as follows: "(a) Except as otherwise provided in this section, the right of any person to claim a privilege provided by Section . . . 980 . . . is waived with respect to a communication protected by such privilege if any holder of the privilege, without coercion, has disclosed a significant part of the communication . . . ."

It seems incredible to us that defendant could fail to realize that in disclosing what he claimed the wife had told him, a confession of murder, he was inviting a response from the wife as to her version of the conversation. The critical test of whether a waiver of a privilege is intended is whether or not there is an expectation of confidentiality. (*People* v. *Carter* (1973) 34 Cal.App.3d 748 [110 Cal.Rptr. 324].) Having in mind that the expressed purpose of the husband-wife privilege is to promote marital harmony and to encourage confidence between spouses, it would be the ultimate irony if one spouse can, under the guise of "squealing" on the other, silence the other's response to his charges, in this case, of murder. Furthermore, there was an abundance of evidence before the trial court upon which it could, as it did, make a finding that defendant had himself disclosed a significant, if twisted, version of his conversation with his

spouse. No error appears in finding a waiver of the husband-wife privilege in this case.

■ The second claim of error is that the trial court admitted, over objection, the testimony of Dr. Rooney, a pathologist who conducted an examination of the victim, Peggy Smith. No objection is raised as to the qualifications of Dr. Rooney. The testimony so strenuously objected to was to the effect that Peggy had an abnormal anus, a condition usually caused by chronic anal intercourse and one which could have existed for years. The medical evidence also disclosed that Peggy had traces of chloroform in her blood.

The remainder of the doctor's testimony concerns the finding of a few red cells under the mucosa of the anus and his very tentative opinion that it was a possibility, and no more, that they had been produced by attempted anal intercourse. We see no error and certainly no prejudice. The doctor in no way engaged in advocacy testimony. He was extremely cautious and guarded in expressing any opinions and his inclusion in said opinions that a slight possibility existed that the blood cells were produced by anal intercourse was balanced by his opinion that the red cells could also have been caused by his examination, by hemorrhoids or other natural pathological conditions, and his testimony was in no way prejudicial to defendant. The evidence was admissible for the slight relevance it had to be considered with other evidence as to whether Peggy had been the victim of a Penal Code section 288 type of molestation by her murderer. It was a matter for the jury to determine the weight and significance to be given the medical testimony and no error appears.

■ Defendant also asserts as error the admission of the testimony of Thomas Eddy who testified over objection that two days before the murders he had heard Peggy's mother in a high state of indignation order defendant out of her daughter's bedroom because, in her words, "He's trying to go down on my daughter." It must be remembered that the prosecution had the burden of showing that the killings were perpetrated during the course of the commission or attempted commission of a crime described in section 189 of the Penal Code, among which crimes is the charge under a section of the Penal Code of lewd and lascivious acts against a child. Although the statement was hearsay, it was clearly admissible under the spontaneous declaration rule established by section 1240, subdivision (b), of the Evidence Code. It was material to establish defendant's motive on the night of the murder in entering the victims' house. (*People* v. *Clark* (1970) 6 Cal.App.3d 658 [86 Cal.Rptr. 106].) The jury was properly in-

structed in accordance with CALJIC instruction No. 2.50 as to the limited purpose for which the testimony was being offered in this case to show "a motive for the commission of the crime charged," followed with the admonition that the jury was "not permitted to consider such evidence for any other purpose."

■ Defendant also objected to the testimony of Barbara Eddy concerning certain statements made to her by her husband, Thomas. Her testimony was presented in the following context. Defense counsel in his cross-examination of Thomas Eddy produced evidence that he (Eddy) had on prior occasions made statements which were inconsistent with his present testimony concerning Mrs. Smith's remark that defendant was trying "to go down on her daughter." In order to rehabilitate Thomas' testimony, Barbara Eddy was permitted to testify that Thomas, prior to any inconsistent statements, had told her on the day of Mrs. Smith's accusation of defendant that "[defendant] had called—or had gotten Peggy in there and he was trying to go down on her." Although under the rationale of *California* v. *Green* (1970) 399 U.S. 149 [26 L.Ed.2d 489, 90 S.Ct. 1930], no instruction need have been given limiting the effect of the testimony by admonishing the jury that the statement was not offered for the truth of the matter but to show a prior consistent statement was made, the fact that such an instruction was given could have redounded only to defendant's benefit. No error appears in the admission of either the testimony of Thomas Eddy or Barbara Eddy. The requirements of section 791 of the Evidence Code were fully met. (*People* v. *Coleman* (1969) 71 Cal.2d 1159 [80 Cal.Rptr. 920, 459 P.2d 248].)

■ The contention that the court erred in giving the jury instructions on first degree felony murder is vigorously urged. As previously noted, the jury was instructed in accordance with the language of section 189 of the Penal Code, enumerating the crimes to which the felony-murder rule applies. CALJIC No. 8.21 was modified and given.[1]

Although the jury had before it defendant's confession to his wife, that confession did not contain any admission as to an intent to commit the crime described in Penal Code section 288. Therefore the question of defendant's intent was one which was required to be proved by circumstantial evidence. The strongest evidence in this regard is the presence of chloroform in Peggy's blood. The abnormal sexual desires directed toward Peggy had been manifested just two days before the killing, the thorough

[1]No claim can be asserted that the instruction as given was not a correct statement of the law. The jury was also instructed on the specific intent required and the degree of proof required as to intent.

familiarity of the defendant with the house in which the victims lived (he having just moved out of it), the medical testimony, although extremely weak, were all matters for the jury to weigh. Added to this was the overwhelming evidence of defendant's participation in the murders, the virtual trail of blood left by him, his footprint in blood, blood on his ring (one victim had been struck with a fist), blood on his car key, blood on his boot which he had attempted to dispose of, the irrational explanation given to his wife as to his motivation for killing both Mrs. Smith and her daughter. (There was no evidence that he had any ill will toward the daughter.) Type A blood, the mother's type, was found all over the house, but no blood of Peggy's type (O) was found, which indicated the probability that Mrs. Smith was slain because she discovered defendant preparing to molest her daughter and was struck and pursued by her murderer until he accomplished her death were also matters which the jury could have considered in finding that the murders were committed during an attempt to violate section 288 of the Penal Code. The apparent immobility of Peggy while alive supports an inference that she was unconscious at the time of death since many blows were struck to accomplish the killing of both mother and daughter.

While the specific intent to commit a violation of section 288 of the Penal Code must be shown beyond a reasonable doubt and the jury was so instructed, that intent may be shown by circumstantial evidence as the jury was likewise properly instructed. (*People* v. *Piccionelli* (1959) 175 Cal.App.2d 391 [346 P.2d 542].) The felony-murder rule was clearly applicable to this case. ■ As was said in *People* v. *Burton* (1971) 6 Cal.3d 375, 387-388 [99 Cal.Rptr. 1, 491 P.2d 793]: "Once a person has embarked upon a course of conduct for one of the enumerated felonious purposes, he comes directly within a clear legislative warning—if a death results from his commission of that felony it will be first degree murder, regardless of the circumstances. This court has reiterated numerous times that 'The purpose of the felony-murder rule is to deter felons from killing negligently or accidentally by holding them strictly responsible for killings they commit.'"

The jury could also have found defendant guilty of premeditated murder of a type which would constitute murder in the first degree. ■ However, there was ample evidence, unlike *People* v. *Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942], to support a felony-murder theory, and the jury was fully and appropriately instructed

upon the subject of felony murder. The evidence of guilt was overwhelming and no error appears in the record.

The judgment is affirmed.

Richardson, P. J, and Regan, J., concurred.