[Crim. No. 25428. Second Dist., Div. Five. Mar. 31, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
LEE DANIEL DORSEY, Defendant and Appellant.

**COUNSEL**

Herbert F. Blanck, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Frederick R. Millar, Jr., and Steven H. Kaufmann, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**LORING, J.**[*]—Count I of an information charged Lee Daniel Dorsey (Dorsey) with a violation of Penal Code section 459 (burglary of a commercial building occupied by Branch Realty at Covina City on July 30, 1972). Count II charged Dorsey with a violation of Penal Code section 447a (arson of a dwelling house at 14346 Gates, Baldwin Park on August 26, 1972). Count III charged a violation of Penal Code section 447a (arson of a dwelling house at 708 Alta Drive, Pomona on September 9, 1972). Count IV charged a violation of Penal Code section 12303.3 (exploding explosive with intent to destroy a residence used as an office building at 890 North Indian Hill Boulevard, Pomona on

[*]Assigned by the Chairman of the Judicial Council.

September 16, 1972); count V charged a violation of Penal Code section 12303.3 (exploding explosive with intent to destroy an aluminum storage shed located at 623 East Arrow Highway, Azusa on September 22, 1972); count VI charged a violation of Penal Code section 470 (forgery of a check for $104.74 with intent to defraud Sears, Roebuck and Company and Security Pacific National Bank on October 20, 1972); count VII charged the same offense against the same victims in the sum of $81.65 on October 21, 1972; count VIII charged the same offense against the same victims in the sum of $94.49 on October 21, 1972. Counts I through V were severed from counts VI through VIII on defendant's motion. A jury returned guilty verdicts (after two and one-half days of deliberation) on counts I through V. Count I was fixed as burglary in the second degree. Dorsey was sentenced to state prison on each count. The sentence on count IV was imposed under Penal Code section 1268. The sentence on counts I, III and V were ordered to run concurrent to the sentence on count IV. The sentence on count II was ordered to run consecutively to the sentence on count IV. Dorsey was given credit for 25 days in presentence custody. On motion of the People counts VI through VIII were dismissed. Dorsey appeals from the judgment of conviction.

CONTENTIONS

The sole contention on appeal is that Dorsey was denied the right of effective representation of counsel under *Ibarra* standards. (*People* v. *Ibarra*, 60 Cal.2d 460 [34 Cal.Rptr. 863, 386 P.2d 487]), because his counsel failed to object on proper legal grounds to certain testimony by Patricia Ann Dorsey (former wife of Dorsey)[1] which constituted privileged communications between husband and wife.

FACTS

*Count I*

The night of July 30-31, 1972, Branch Realty premises were burglarized; books, records, cards, papers, typewriters, adding machines, file cabinets, and small change from a piggy bank were taken. A tire iron from a Toyota car was later found on a desk in the office. Dorsey had worked for Branch Realty several months before and had visited the office a few days before the burglary. Dorsey became a suspect. Mrs. Dorsey testified that the evening before the burglary at the Branch

---

[1]Patricia Ann Dorsey testified that she and Dorsey were going through a divorce proceeding and that she thought that the decree was "final."

Realty and also a day or two before, Dorsey told her that he was going to rob the Branch Realty, "that they were trying to bankrupt him."

The day after the burglary Dorsey drove Mrs. Dorsey to Salton Sea to visit his parents. Enroute they drove off the highway on a dirt road near the City of Covina to a point where a pile of material was burning. Dorsey then told Mrs. Dorsey (according to her testimony) that this was where he burned the stuff he had taken from Branch Realty. Mrs. Dorsey took sheriff's deputies to the point later, where they retrieved partially burned documents and other material which had been taken from Branch Realty in the burglary.

Dorsey's defense on count I was an alibi that on the night the Branch Realty was burglarized he was painting (all night) at the Windjammer Bar at Salton Sea. Receipt for certain rental equipment tended to support his alibi. His alibi was supported by several other witnesses.

### Count II

The Gates Street arson on August 26, 1972, was caused by rags in a closet soaked in a flammable liquid apparently ignited by an electric wire plugged into a wall plug. David Brown testified that he and Dorsey set the fire by spreading gasoline around and igniting it with an extension cord and that Dorsey told him he wanted to burn down the residence to collect insurance. Mrs. Dorsey testified that Dorsey told her that a man named Caproni had put furniture in the house to make it look occupied and that he and Gene Gilmore were going to burn it down to collect insurance because he, Dorsey, could not sell it. Mrs. Dorsey testified that the day before the fire Dorsey told her "we're going to burn it down," and the night the fire was to have been committed Dorsey drove her by the house to see the fire but it was not burning and that he would return to determine why. Later Dorsey returned home and said the fire department was there and the place was "burning wild."

He took her back the next day to show her the house burned up.

### Count III

The residence dwelling on Alta Drive, Pomona, was set on fire on September 9, 1972, but the fire was extinguished after only partial damage. Investigation disclosed that the fire started at two different points—in the living room by a soldering or woodburning tool plugged

into an electrical outlet and laying on top of a rug under which there was a box of paper matches, and on a carpet in the recreation room.

David Brown testified that Dorsey told him to spread gasoline around the carpeting in the house and he observed Dorsey put a hot iron in a shoe box with matches and place the shoe box under the carpeting.

Mrs. Dorsey testified that Dorsey took her by the house the next day and indicated that he and Brown had started the fire, but there was not as much damage as they expected.

### Count IV

An explosion and fire occurred at 890 Indian Hill, Pomona, on September 16, 1972. The explosive device was galvanized pipe with holes drilled into it which holes had been used as a fuse.

Mrs. Dorsey testified that about a week before the explosion and fire she went with Dorsey to pick up Brown. They picked up a box of rags and gas and went to 890 Indian Hill where Dorsey had Brown get out and placed the box. Nothing happened. She also testified that about a week after the explosion and fire Dorsey told her that he had planted a pipe bomb there and it had gone off.

Brown testified that he had gone to 890 Indian Hill with Dorsey several times and the last time they took a small glass jar filled with gasoline and a sponge, but he did not see anyone light it. They returned later to the building with a pipe about five inches long filled with gun powder with a hole drilled in a cup at one end with gun powder coming out. The pipe was placed in a shoe box with gun powder all around it. Brown testified that he saw Dorsey make the bomb. Dorsey told Brown to light a small birthday candle which when it burned down would ignite the gun powder. The box was set next to the hot water heater.

### Count V

On September 22, 1972, an explosion occurred in a metal shed at 622 East Arrow Highway. Investigators recovered pieces of a pipe and fiberboard material from a box.

Brown testified that he and Dorsey went to the building and Dorsey gave him the box and told him to place it under the shed and light it, which he did.

Mrs. Dorsey testified that Dorsey told her before the explosion "that they ought to do something to themselves to look like someone else was doing the jobs instead of them."[2]

The defense to counts II, III, IV and V consisted merely of a denial and an attempt to attack the credibility of the People's witnesses.

## DISCUSSION

When the matter of eliciting from Mrs. Dorsey statements made to her by Dorsey first arose, Mrs. Dorsey was being examined about an incident which occurred in which Dorsey drove her past the Branch Realty office several times when he had a gun.

The following occurred:

"Q. And while driving past the office or just before driving past the offices, did he tell you what he was going to do?

"A. Yes.

"MR. VROMAN: Objection. Any statement made by Mr. Dorsey to her would be hearsay.

"THE COURT: There's no question. Are you objecting to this question?

"MR. VROMAN: Withdraw my objection.

"THE COURT: All right.

"MR. VROMAN: It's premature.

"Q. BY MR. ROTH: What did he tell you?"

Dorsey's counsel objected to the last question on the ground that it called for "hearsay." The objection was sustained. An argument at bench then ensued, in the course of which the question was withdrawn. Defense counsel then moved to strike all of the evidence about driving past the Branch Realty office with the gun. The court indicated that it was about

---

[2]This statement related to the fact that Gilmore Realty operated at that address and Dorsey was associated with Gilmore Realty.

to reverse its ruling. The prosecutor, in resisting the motion to strike, indicated that he intended to ask the same question later. The motion to strike was denied. The prosecutor then took up the subject of what happened the evening of the burglary at Branch Realty, and the following occurred:

"Q. All right. Before your husband left that evening—did he go out somewhere?

"A. Yes.

"Q. Before he left to go out, did he tell you where he was going?

"A. Yes.

"Q. What did he tell you?

"MR. VROMAN: Objection. Hearsay. Offered to prove the truth of the matter stated.

"MR. ROTH: We'll offer this as an admission as to Count I."

An argument then ensued at bench in which the following occurred:

"THE COURT: We're at the bench beyond the hearing of the jury.

"Mr. Roth, what's your offer?

"MR. ROTH: It's going to be an admission against the defendant—

"THE COURT: It is for me to decide. That's why I asked you what your offer was. In other words, I need to know what the statement is. That's what I meant.

"MR. ROTH: Yes. She will testify that he said he was going over to burglarize Branch Realty with another person.

"THE COURT: Mr. Vroman.

"MR. VROMAN: I guess he's offering it under the admission—

"THE COURT: All right.

"MR. VROMAN: —statement.

"THE COURT: Objection overruled."

The following then occurred:

"Read the question to the witness.

"(Question read.)

"THE COURT: Answer the question.

"THE WITNESS: Can I think a minute?

"He told me that he was going to Branch Realty to bomb or to take—

"Q. BY MR. ROTH: Take your time now.

"A. All right. He said he was going to Branch Realty to rob them, that they were trying to bankrupt him.

"Q. Now, at any previous time before that evening, had he spoken to you in reference to Branch Realty?

"A. Yes.

"Q. And when was the time before that?

"A. A day or two before.

"Q. And what did he tell you on that occasion?

"A. Pretty much the same thing; that they were out to bankrupt— bank—bankrupt Branch Realty, and that he was going to destroy that office. To do what he could."

"     .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. And on this—on this occasion, this day when you drove several

times in front of the two Branch Realty Offices, did your husband tell you what he wanted to do?

"A. Repeat it.

"MR. ROTH: Could the question be read?

"THE COURT: Read the question.

"(Question read.)

"THE WITNESS: Yes.

"Q. BY MR. ROTH: What was that?

"A. He wanted to shoot the windows."

Mrs. Dorsey testified thereafter without objection to statements made to her by Dorsey either before or after or both before and after each event alleged in each of the five counts which statements indicated his guilt as charged.

Dorsey argues on appeal that his counsel failed to make the proper objection, a claim of privilege, to questions asked of Mrs. Dorsey regarding statements made to her by her husband. He argues that this incompetence of counsel was tantamount to the withdrawal of a critical defense—the defense of privileged communications between husband and wife which would have eliminated much of the damaging evidence against him. Dorsey contends that this error was of *Ibarra* proportions. The prosecution contends that evidence of the oral communications between Dorsey and Mrs. Dorsey was not critical and that Dorsey's guilt was established by other evidence which was substantial, to which Dorsey replies that the other evidence consisted almost entirely of the testimony of an accomplice (Brown), and the fact that the jury deliberated two and one-half days indicates that this was a close case and that the testimony of Mrs. Dorsey was not only critical but it tipped the scales against him and removed the reasonable doubt that he was entitled to.

This problem requires the consideration of at least four separate sections of the Evidence Code, sections 970,[3] 971,[4] 980,[5] and 981.[6]

Sections 970 and 971 deal with the privilege of a spouse not to be a witness against his will against the other spouse. This privilege is above and beyond the privilege not to disclose privileged communications. It is individual to the spouse called as a witness and may not be claimed by the spouse against whom the testimony is offered. Section 970 and 971 therefore effected a substantial change in prior Code of Civil Procedure section 1881, subdivision 1 and former Penal Code section 1322 which also extended the privilege to the party spouse against whom the testimony was offered. For prior law see *People* v. *Bradford,* 70 Cal.2d 333 [74 Cal.Rptr. 726, 450 P.2d 46]. See also *People* v. *Saidi-Tabatabai,* 7 Cal.App.3d 981 [86 Cal.Rptr. 866]. In the case at bar the record discloses that Mrs. Dorsey was aware of her privilege not to testify under Evidence Code sections 970 and 971. She expressly waived that privilege. However, in the case at bar there is an additional factor which indicates that the privilege may not have existed in any event because Mrs. Dorsey may have obtained a final decree of divorce at some point in time. The record does not disclose the precise date of the final decree.

The marital privilege does not exist as to observations, such as mental condition, where the parties are separated by divorce. *People* v. *Loper,* 159 Cal. 6 at pages 13, 14 [112 P. 720]. ■ Since sections 970 and 971 are each couched in the present tense, it is clear that the privilege of not

---

[3]Section 970 reads: "Except as otherwise provided by statute, a married person has a privilege not to testify against his spouse in any proceeding."

[4]Section 971 reads: "Except as otherwise provided by statute, a married person whose spouse is a party to a proceeding has a privilege not to be called as a witness by an adverse party to that proceeding without the prior express consent of the spouse having the privilege under this section unless the party calling the spouse does so in good faith without knowledge of the marital relationship."

[5]Section 980 reads: "Subject to Section 912 and except as otherwise provided in this article, a spouse (or his guardian or conservator when he has a guardian or conservator), whether or not a party, has a privilege during the marital relationship and afterwards to refuse to disclose, and to prevent another from disclosing, a communication if he claims the privilege and the communication was made in confidence between him and the other spouse while they were husband and wife."

(Note: Section 912 deals with waiver of privilege and provides in part: ". . . In the case of the privilege provided by Section 980 (privilege for confidential marital communications), a waiver of the right of one spouse to claim the privilege does not affect the right of the other spouse to claim the privilege.")

[6]Section 981 reads: "There is no privilege under this article if the communication was made, in whole or in part, to enable or aid anyone to commit or plan to commit a crime or a fraud."

being a witness against a spouse does not exist after the marital relationship is terminated by divorce. *People* v. *Bradford,* 70 Cal.2d 333, 342, 343 [74 Cal.Rptr. 726, 450 P.2d 46].

We conclude, therefore, that if at the time she testified Mrs. Dorsey had obtained a final decree of divorce she was competent to be a witness against Dorsey as to observations and facts which occurred during the marriage. If no such final decree had been obtained, she and she alone could claim a privilege not to be a witness. No such claim of privilege was made.

■ However, we are confronted by an entirely different problem in considering matters of confidential communication between husband and wife under sections 980 and 981. The privilege not to testify at all and the privilege not to testify to privileged communications are two entirely separate and distinct privileges. *People* v. *Bradford,* 70 Cal.2d 333, 342 [74 Cal.Rptr. 726, 450 P.2d 46]. That privilege against disclosure of privileged communications is vested in each spouse and consequently if a spouse is called as a witness he or she may not testify as to confidential communications without his or her consent *and* the consent of the other spouse. Either spouse may claim the privilege. (See Law Revision Commission note to § 980.) See *North* v. *Superior Court,* 8 Cal.3d 301 [104 Cal.Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155]; Witkin, California Evidence, section 839, page 782. The privilege survives the termination of the marriage and continues to exist even though the marriage has been terminated by divorce. See Law Revision Commission Comment to section 980; Witkin, California Evidence, section 840. The privilege exists even though the marriage is annulled for fraud since prior to the decree of annulment the marriage is voidable only. *People* v. *Godines,* 17 Cal.App.2d 721, 727 [62 P.2d 787]. However, the privilege encompasses only communications between husband and wife during marriage. It does not extend to physical facts which are observed, which do not constitute "communications." Witkin, California Evidence, section 841, page 783.

■ Section 981 authorizes a limited exception to section 980. It does not appear that most of the communications which Mrs. Dorsey testified to with regard to Dorsey (which were subject to the claim of privileged marital communications) were admissible under section 981. With reference to section 981, the Law Revision Commission comment reads in part:

"It is important to note that the exception provided by Section 981 is quite limited. It does not permit disclosure of communications that merely reveal a plan to commit a crime or fraud; it permits disclosure only of communications made to enable or aid anyone to commit or plan to commit a crime or fraud. Thus, unless the communication is for the purpose of obtaining assistance in the commission of the crime or fraud or in furtherance thereof, it is not made admissible by the exception provided in this section. . . ."

Except as hereafter indicated there is nothing in the statements by Dorsey as testified to by Mrs. Dorsey which would indicate that the statements were made in whole or in part to enable or aid Dorsey to commit or plan to commit a crime. There are certain exceptions to the foregoing statement. Mrs. Dorsey was a witness to various acts and declarations by Dorsey in which he issued instructions to Brown in the actual commission or attempt to commit a crime, particularly as to count IV. Those declarations would clearly be admissible under Evidence Code section 981. Furthermore, these declarations were not privileged marital communications in any event since they were directed to Brown, not to Mrs. Dorsey and they were not privileged since Brown was present and they were therefore not "made in confidence." Evidence Code section 980; Witkin, 'California Evidence (2d ed.) section 842, page 784. ■ Primarily, however, Mrs. Dorsey testified to statements made by Dorsey before the alleged commission of an offense as to what he intended to do or why he intended to do it or how he intended to do it, or after the alleged commission of a crime as to what he had done, why he had done it or how he had done it. Those communications were within the privilege of Evidence Code section 980 and Dorsey could have precluded testimony by Mrs. Dorsey if proper claim of privilege had been appropriately and timely made. No such claim of privilege was made by Dorsey's counsel. Instead, initially, objection was made that the statements were hearsay and since an admission is admissible as an exception to the hearsay rule under certain circumstances, that objection was properly overruled.

The People argue here that the failure to claim the privilege was a matter of trial tactics rather than because of the incompetence of counsel. Curiously, the People argue: "In light of all the evidence, repeated attempts to keep out Mrs. Dorsey's testimony regarding her husband's statements might result in the jury drawing an inference unfavorable to appellant, that is, that he was trying to hide something." If we read the argument correctly and as intended, the People argue, in

effect, that the reason the privilege was not claimed was because counsel did not want to look bad by making repeated objections in the presence of the jury. The claims should have been asserted and ruled upon *in camera*. The argument illustrates that the point is devoid of substance. There is nothing in the record to legally justify the assertion that counsel refrained from claiming the privilege as a matter of trial tactics except an argument by the People here that counsel wanted to discredit Mrs. Dorsey by showing that she lied consistently, which is based upon the fact that Dorsey's counsel engaged in extensive and intensive cross-examination. We do not agree that that proves the point since such cross-examination would have been wholly unnecessary if the privilege had been properly claimed.

The People argue that Dorsey's guilt was established by overwhelming evidence and that the testimony of Mrs. Dorsey, which was subject to the claim of privileged marital communications did not make the difference between a guilty verdict and an acquittal. We cannot in good conscience agree. Almost the entire case of the People was based on the testimony of accomplice Brown and the testimony of Mrs. Dorsey. The testimony of Mrs. Dorsey regarding privileged communications with Dorsey to which objection might have been made related to each of the five counts on which Dorsey was convicted. As we have already indicated, some of the testimony of Mrs. Dorsey related to observations of fact which were not privileged, and some related to communications relating to conversations which were not privileged under Evidence Code section 981. There was some minor additional evidence such as the fact that Dorsey drove a Toyota automobile, and a tire iron from a Toyota was found later at the scene of the Branch Realty burglary. (Judging from the number of Toyotas encountered daily on our streets, this "evidence." was not very distinctive.)

We conclude that the failure of Dorsey's counsel to make appropriate claim of privilege *in camera* or otherwise to such critical evidence which was so obviously inadmissible amounted to a denial of effective representation by counsel. *People* v. *Williams,* 22 Cal.App.3d 34 [99 Cal.Rptr. 103]. Here not only did counsel fail to make a proper objection but he cross-examined Mrs. Dorsey extensively about the privileged conversations with Dorsey. Defense counsel even cross-examined on conversations not discussed on direct.

Under the unique circumstances of this case (that the People's case was based almost entirely on the testimony of an accomplice and the

testimony of Mrs. Dorsey and much of the testimony of Mrs. Dorsey consisted of privileged communications which should have been excluded on proper claim of privilege *in camera* or otherwise), we cannot say to a moral certainty that the incompetence of counsel was harmless beyond a reasonable doubt. *Chapman* v. *California*, 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]. Under these circumstances reversal is required.

The judgment is reversed.

Ashby, Acting P. J., and Hastings, J., concurred.