Filed 8/4/21  P. v. Hancock CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BRIAN ELERON HANCOCK,<br><br>    Defendant and Appellant. | D077338<br><br><br><br>(Super. Ct. No. SCD277179) |

APPEAL from a judgment of the Superior Court of San Diego County, Joan P. Weber, Judge.  Affirmed.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant.

Matthew Rodriguez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Brian E. Hancock of first degree murder for the brutal slaying of a sexual partner.  The trial court sentenced Hancock to 75 years in

state prison.  On appeal, Hancock argues his conviction should be overturned because the court erred by admitting into evidence statements he made to his wife that were protected by the marital communication privilege.  Hancock also argues reversal is required because of prosecutorial misconduct.  Specifically, Hancock challenges statements made by the district attorney in his closing rebuttal argument that Hancock asserts shifted the burden of proof to the defense.  As we shall explain, we reject these two arguments and affirm the judgment of conviction.[1]

FACTUAL AND PROCEDURAL BACKGROUND

*1. The Prosecution's Case*

For several months in 2017, Hancock met regularly with the victim, Peter Bentz, for sex at Bentz's apartment in the San Diego neighborhood of Ocean Beach.  On Friday, November 17, 2017, Hancock took his girlfriend, Rosa H., to Bentz's apartment.  Rosa had not been to the apartment before.  All three smoked methamphetamine.  Hancock and Bentz then had sex on the couch, while Rosa looked on, then Hancock and Rosa had sex on the couch while Bentz watched.  After, when Bentz excused himself to use the restroom, Hancock took a credit card from Bentz's wallet.

Hancock and Rosa said goodbye, then left with Bentz's credit card.  They stopped for dinner at Kentucky Fried Chicken, where Hancock paid with the stolen card.  After they finished eating, Hancock dropped Rosa off at her mother's home.  Later that night, Rosa was sent a link through Facebook

---

[1]     After briefing was completed in this matter, defendant filed a notice of abandonment of appeal and request for dismissal.  Once the record has been filed with this court, we have discretion to deny such a request for dismissal.  (Cal. Rules of Court, rule 8.316(b)(2).)  The filing does not indicate the reason for the abandonment and at this late stage of the appeal, we deny the request for dismissal.

Messenger. She could not open the link, but assumed it was a video of her and Hancock having sex at Bentz's apartment that Bentz had filmed without her knowledge.

Rosa had a boyfriend and was with him when the message arrived. She panicked when she saw the link because she did not want her boyfriend to discover her affair with Hancock. Rosa forwarded the link to Hancock and texted him about her assumption it was a video of them in a comprising situation. Hancock was also married, to Angelina H., at the time of the encounter. Hancock told Rosa over text that he would take care of the video.

On November 21, 2017, the Tuesday before Thanksgiving, around 2:00 p.m., Hancock sent Bentz a message on Facebook asking if he could come by. Shortly after, Hancock and Bentz spoke on the phone and Hancock told Bentz he was getting cleaned up to come over. Hancock's friend and drug dealer, Tori F., was with Hancock when he spoke with Bentz. Tori testified that on that day, Hancock told her about the sex video and that he was angry about it. Hancock told Tori he was "going to kill" Bentz.

Cell phone records showed Hancock in the vicinity of Bentz's apartment at 3:12 p.m. At some point later in the day, Hancock told Tori that he had stabbed Bentz seven times, and that because Bentz was a "big guy" it had been hard to take him down. Hancock also told another friend, Johnny W., about the video and that he put Bentz "on vacation." Cell phone data showed both Hancock's and Bentz's phones leaving the area of Bentz's apartment around 7:00 p.m. and traveling southbound on Interstate 5 until reaching the vicinity of Hancock's home in the south San Diego neighborhood of National City.

That afternoon before returning home, Hancock called Angelina between 5 and 10 times, "almost back-to-back." During the calls, Hancock

3

was scared and panicked. Angelina testified she had never experienced Hancock in such an extreme emotional state in their twenty-plus year relationship. Angelina said Hancock came home briefly around 7:00 p.m. and appeared to be in a "full panic attack. He was breathing quickly and heavily." Hancock's "eyes were wide and [he] was sweaty, stressed, [and] scared." After a half hour, Hancock left. The brakes on his truck were not working, so he took Angelina's car. Fifteen or twenty minutes later, Hancock returned to the house and asked Angelina to drive him to Walmart. Angelina dropped him off and Hancock did not return home that night.

Using one of Bentz's credit cards, Hancock made several separate purchases at Walmart in the early hours of the next morning and one purchase at a Smart & Final store. The purchases included a new cell phone that he registered using his middle name as his last name. Hancock asked Tori to be a look out for him while he cleaned Bentz's apartment. Tori refused. Hancock also texted Rosa asking for help, but she did not respond.

The next morning, Wednesday, November 22, 2017, Angelina took their two children to school and went to work. Just after noon, Hancock used Bentz's credit card again, this time to purchase cleaning supplies from another Smart & Final store. Sometime between 10:00 a.m. and noon, Hancock called Angelina and asked her to purchase cardboard boxes. He told Angelina the boxes were to replace old ones storing their Christmas ornaments. Angelina purchased boxes and met Hancock with them at their home sometime before 6:00 p.m. Angelina handed the boxes off to Hancock, who left and again did not return home again that night. Angelina never saw the boxes again.

Later that day or the next morning, Hancock told Angelina over the phone that he had used the boxes in an unsuccessful attempt to create a

vessel to transport Bentz's body. Angelina was concerned that the boxes she purchased were being used for criminal purposes. Angelina testified that during this period, Hancock was still highly stressed. Hancock also asked his wife to help him dispose of the body, which he had trouble lifting because he had a back injury. Angelina refused to help him.

The following day, Thanksgiving, Hancock returned home late in the morning and spent the next few hours celebrating the holiday with Angelina's family. That evening, Hancock asked Angelina to help him return a car he had borrowed from a friend. Angelina followed Hancock, who was driving a silver SUV that Angelina had never seen before, to Logan Heights. Hancock asked Angelina to drive around while he met the friend, and told her he would call when he was ready to be picked up.

Angelina drove around, then grew impatient and went back to the strip mall where she had last seen Hancock. There, Angelina saw the SUV parked and Hancock putting items from the rear into a plastic shopping bag. Hancock got into Angelina's car with the bag and she started driving. After just a block, without warning, Hancock asked Angelina to stop the car. She complied, and Hancock jumped out and threw the plastic bag over a nearby chain-link fence.

Hancock directed Angelina toward home on side streets, not the faster freeway route. Angelina realized the SUV was Bentz's and began to panic that she was involved in covering up a murder. During the drive, Angelina questioned Hancock about what was going on. Hancock confirmed the SUV was Bentz's and told Angelina the bag he had thrown contained Bentz's wallet.

The couple then drove to Walmart in La Mesa and purchased groceries for the family using Bentz's credit card. Once home, Hancock told Angelina

he had an upcoming job stocking at a warehouse and needed a car. Angelina's friend had offered to let them use an SUV the weekend before when Hancock's truck had started acting up. Angelina texted her friend, who agreed to lend Hancock the SUV. Angelina dropped Hancock at the friend's house to pick up the car and Hancock left with it. He did not return home that night.

The following day, Friday, November 24, 2017, Hancock purchased a 10-inch table saw, a shovel, a rug, a dolly, a mattock, weatherproof gloves, and a $50 gift card at Home Depot using one of Bentz's credit cards. Around 3:30 p.m., Hancock drove east of San Diego to an area known as Campo. Cell phone records showed Hancock remained in that area until about 9:00 p.m. When Hancock returned home, Angelina saw him clean blood and matted hair off of his leg.

Saturday afternoon, Angelina drove Hancock back to the strip mall where he left Bentz's SUV. Hancock moved the SUV to a parking lot in Mira Mesa. Several hours later Angelina picked Hancock up in Mira Mesa and they took their children to ice cream on the drive home.

During the week of Thanksgiving, Hancock brought home items that he had stolen from Bentz's apartment: a chess set, china dishes, and a stamp collection. Hancock asked Angelina if she wanted to keep any of the items. She told him no, and to get rid of the items. Hancock also told Angelina he had buried a ring that belonged to Bentz in their backyard. Angelina told Hancock to dig up the ring and get rid of it. Hancock later showed the ring to Angelina. The next week, Hancock and a friend pawned several items, including an army class ring believed to have belonged to Bentz.

On November 29, 2017, Hancock and Angelina cleaned the SUV they had borrowed and returned it. At Hancock's request, Angelina erased all of

6

the text messages and call logs between them from November 17, 2017 to November 24, 2017.

On December 4, 2017, Bentz's brother called the San Diego police department and reported Bentz missing. Bentz had not shown up for Thanksgiving dinner, a tradition he never missed. Bentz also did not respond to numerous phone calls and text messages. Because Bentz and his brother shared a cell phone account, his brother's wife accessed Bentz's phone records and discovered that Bentz did not have any activity on his phone after November 21, 2017. She called numbers from Bentz's phone records to see if she could get any information about his whereabouts and enlisted a friend of Bentz's, Gilda B., to help. On December 6, 2017, Gilda called Hancock and identified herself and her purpose. Hancock told Gilda he had last texted with Bentz on November 20, 2017 and had not spoken with Bentz since before Thanksgiving.

On December 7, 2017, police officers conducted a welfare check at Bentz's apartment. The apartment manager let the officers in. Nothing seemed unusual or out of place, so the officers left. On December 12, 2017, police located Bentz's SUV in the parking lot in Mira Mesa where Hancock had left it on November 25, 2017. The car was open, the windows were rolled down slightly, the sunroof was open, the keys were in the ignition, and a spare set of keys sat on the dashboard. A milky substance, which detectives believed was a dried chemical used to clean the car, was on the inside of the windows, the dashboard, and the door panels. There were also cleaning wipes in the SUV.

On December 14, 2017, the police homicide team searched the area in Logan Heights where Hancock originally left Bentz's SUV. A license plate reader in the area had recorded Bentz's plate. The police discovered the

7

same type of cleaning wipes found in the SUV and a cleaning product on the sidewalk. A block away, the police discovered the plastic bag that Hancock had thrown over the fence. The bag contained Bentz's wallet, rent payment receipts, Veteran's Affair card, and insurance cards. Near the bag was Bentz's cell phone and some blood-stained paper towels.

After these discoveries, the police returned to Bentz's apartment. Investigators determined the apartment had been cleaned to cover up a crime. Rugs and furniture were moved to hide bloodstains, including a large, concentrated bloodstain in the living room known as a "saturation stain," which develops when a person bleeds out. A criminalist concluded Bentz suffered a "significant bleeding injury" at the location of the saturation stain. While the top of the carpets appeared clean, the underside of the carpet was bloodstained. Bloodstains were also discovered on the deadbolt of the front door and around the kitchen sink. Chemical residue like that discovered in Bentz's SUV was also found throughout the apartment and bottles of cleaning products were left on the kitchen floor.

Several items were missing from the apartment, including a cedar hope chest (measuring about four or five feet by two feet), Bentz's army class ring (believed to have been pawned), two gold chains, a computer, and camera equipment.

Hancock quickly became a suspect based on phone records and information recovered from Facebook showing communications about the alleged sex video and the relationship between Hancock and Bentz. The Facebook data revealed Hancock had planned to be at Bentz's apartment on November 21, 2017.

DNA testing also revealed information about Bentz's death. An expert concluded Bentz's DNA matched that found on blood samples taken from the

carpets, door lock, and kitchen. DNA from Bentz and Hancock was found on a knife in the kitchen, and Hancock's DNA could not be excluded from a sample taken from the cleaning products in the apartment. Hancock's DNA also matched samples from the door lock and the kitchen sink.

Cell phone records also provided significant information about the case. They showed Hancock's phone at Bentz's apartment on November 21, 2017, and Hancock's and Bentz's phones traveling simultaneously from Bentz's apartment to Hancock's home. Bentz's phone stopped working at 7:14 p.m. on November 21, 2017.

Hancock's phone records showed his route to Campo on November 24, 2017. In that area police also discovered a path leading to a hole measuring two feet by four feet. They also found a hatchet, a product tag for a mattock, and a plastic spray bottle. Police also noticed a foul smell in the area.[2] Search canines were brought to the area, but did not alert to their handlers. The dogs did alert to the tailgate of Bentz's car and two spots in the backyard of Hancock's home.

On January 23, 2018, Hancock was arrested. On a recorded telephone call from jail with Angelina, after learning she had spoken with police, Hancock accused Angelina of betraying him and told her his "fate ha[d] been sealed." Hancock berated Angelina by repeatedly telling her that all she had needed to do to protect him was ask for an attorney. On the call, he asked Angelina, "Did you tell them where? Did you tell them where?"

---

[2] After the fourth day of the trial, the prosecutor received notification from the federal Department of Justice that Bentz's dental records had been matched to a skull that was recovered in Campo in May 2018. Hancock's counsel objected to the introduction of the new evidence and the court sustained the objection, ruling it would be highly prejudicial to the defense to allow the evidence at that stage of the litigation.

*2. Defense Case*

Hancock testified in his own defense. He told the jury that after he was laid off in 2017 as a result of a back injury, he began using methamphetamine on a daily basis. Hancock testified that he met Bentz when he hired Hancock to fix a ceiling fan in his apartment. Bentz contacted him shortly after for another electrical job, and after that second meeting their relationship became sexual. Hancock stated that he visited Bentz's apartment regularly, approximately once per week or week and a half, throughout the fall of 2017. During these meetings the men would have sex and use marijuana and methamphetamine. During one encounter they used heroin together.

Hancock admitted that he was also having an affair with Rosa during this time period, and that Angelina had discovered that relationship. He stated that his marriage was in trouble during the second half of 2017 because of his unemployment and drug use. Hancock also admitted that he had taken Rosa to Bentz's home on Friday, November 17, 2017 and that the sexual encounters described by Rosa during her testimony had occurred. He said that he asked Bentz if he could borrow some money to buy Rosa dinner. According to Hancock, Bentz had given him his credit card to use and it was not taken without Bentz's permission.

On November 21, 2017, Hancock returned to Bentz's apartment. He testified he intended to ask Bentz about the video Rosa said she received, but he was not angry. Rather, he just wanted to understand if Bentz had filmed them without their knowledge. Hancock said when he got to Bentz's apartment there were three other men there, Tom, Raul, and a third man whose name he could not remember. Hancock testified he asked Bentz if they could speak in private. Bentz agreed and Hancock returned the credit

10

card he had borrowed and asked about the video. Hancock said Bentz denied filming them and Hancock believed Bentz.

According to Hancock, after their conversation, they rejoined the others who were drinking beer and smoking marijuana. Hancock said Bentz then asked Hancock if he was willing to participate in a group sex video in exchange for $3,000. According to Hancock, he agreed to participate but left around 7:00 p.m., before the video was completed, because Angelina and their children were expecting him. Hancock explained that he returned to Bentz's apartment later that evening to complete the video, and that Bentz gave him $600 in cash and permission to use his credit cards for the rest of the payment. He explained the cell phone data showing the simultaneous movements of his and Bentz's phones by stating that he found Bentz's phone in his car on his way home, then returned it to Bentz's apartment when he went back.

Hancock testified that after completing the pornographic filming, Bentz let him borrow his SUV and he left Bentz's apartment around 2:00 a.m. on November 22, 2017. Hancock then met up with Tori at the homeless encampment where she lived. He explained the various credit card purchases over the following days were with Bentz's permission and payment for the pornographic film. He denied telling Angelina, Rosa, or Tori that he had killed Bentz, or that he needed help moving the body or cleaning the crime scene. Hancock claimed he had seen Bentz on November 22, 24, and 26, 2017, and that he had given Bentz receipts for each purchase and returned the credit cards to him on the 26th. He explained many of his movements around town as being related to his work as an electrician.

Hancock claimed that Bentz decided not to go to his brother's home for Thanksgiving because he did not want his family to see he had returned to

11

heavy drug use. Hancock also claimed that Bentz was planning to leave on November 27 or 28, 2017 for Ixtapa, Mexico with Raul. Hancock assumed when he could not contact Bentz after November 26th that Bentz had left for his vacation. Hancock also stated that on November 24, 2017, he gambled at the Golden Acorn Casino for four or five hours, explaining the cell phone data showing him near Campo. He said the statements he made to Angelina on the phone from jail were related to a large quantity of methamphetamine he had stashed at their house that he feared the police would find.

Hancock also presented the testimony of a DNA expert who questioned the prosecution's expert's conclusions and methodologies.

*3. Verdict & Sentencing*

After the conclusion of the evidence, closing arguments, and almost three days of deliberations, the jury returned a guilty verdict on the charge of first degree murder. Thereafter, Hancock admitted the truth of his prior felony convictions. The trial court sentenced Hancock to an aggregate term of 75 years to life in prison, consisting of 25 years to life for first degree murder, tripled for the prior strike convictions. Hancock timely appealed the judgment of conviction.

DISCUSSION

I

*Marital Communication Privilege*

Hancock first argues reversal is required because the court erroneously admitted privileged communications between him and Angelina. The Attorney General responds that the court's evidentiary determinations were

appropriate and, alternatively, even if privileged communications were improperly admitted the error was not prejudicial.

A

*Additional Background*

Angelina divorced Hancock after his arrest. She testified against him at trial after entering an immunity agreement in which the district attorney agreed not to prosecute Angelina for her involvement in the cover-up of the murder. Before trial, Hancock moved in limine to preclude Angelina from testifying to statements he made that were protected by the marital communication privilege set forth in Evidence Code section 980.[3]

The prosecution opposed the motion and filed a separate motion in limine seeking to admit Angelina's statements. The prosecution's motion set forth five categories of expected testimony: (1) statements made by Hancock to Angelina about the murder that were made in confidence; (2) statements made by Hancock that were overheard by Angelina; (3) statements made by Hancock to involve Angelina in the crime or cover-up of the murder; (4) observations of Hancock's actions by Angelina; and (5) statements Hancock made to Angelina in jail calls, visits, and mail. Only the first category, the district attorney asserted, was protected by the marital communication privilege. The second and fifth categories were not protected because the statements were not confidential, the third category was subject to the crime-fraud exception to the privilege under section 981, and the fourth category were not "statements" and thus not protected.

At the hearing on the motions, the court ruled that statements in categories two, four and five were not protected by the privilege. The parties

---

[3] Subsequent undesignated statutory references are to the Evidence Code.

13

and court then examined Angelina's testimony at the preliminary hearing and debated which statements fell into category one, which the court agreed was protected by the privilege, and which fell into category three, which was subject to the crime-fraud exception. The prosecutor asserted that all of the statements Hancock made to Angelina after his initial disclosure that he killed Bentz were subject to the crime-fraud exception because Hancock was attempting to bring Angelina into his criminal efforts to cover up the murder. Hancock's counsel argued that his statements to Angelina the night of the murder remained protected because he was not specifically asking for help with his efforts to dispose of the body and clean the apartment, but only for a ride or because he was just "trying to figure out what to do."

The court found that statements by Hancock made in furtherance of the crime (specifically to get rid of the body or clean the apartment), regardless of Angelina's awareness of the purpose, were admissible under the crime-fraud exception. The court explained, "I don't allow in, [']He's talking to her and panicking about the murder and that's to groom her to help him.['] … I think that is still covered by his marital communication privilege. But I do – anytime he has a conversation where he's asking her to do anything – boxes, drive me to the movie, drive me to the Walmart, drive me to meet Eddie – all of these things, I believe he is desperate to get help to get that body out of there and get it cleaned up. And so those are all crime-fraud exceptions."

After argument, the court ruled that Hancock's statements to Angelina involving her driving him to various places and helping with boxes and cleaning supplies were admissible under the crime-fraud exception. With respect to any other statements, the court ordered the district attorney to create a chart outlining Angelina's expected testimony and the basis for its

14

admission to be considered at a further hearing. At that next hearing, after indicating it had examined the information submitted by the district attorney and the relevant case law, the court stated its view that the "crime-fraud exception provided by section 981 is quite limited. It does not permit disclosure of communications that merely reveal a plan to commit a crime or fraud. [¶] It permits disclosure only of communications made to enable or aid anyone to commit or plan to commit a crime or fraud."

The court then made specific rulings about particular areas of inquiry.[4] The court ruled several categories of statements Hancock made to Angelina were admissible under the crime-fraud exception to the marital communication privilege: statements concerning needing help to move the body and contacting Tori and her boyfriend for that help; statements that Hancock wanted Angelina to help check on the location of the body in Campo to ensure it was sufficiently buried; statements related to cleaning the car Hancock borrowed to ensure there were no traces of the body; asking Angelina for garbage bags and boxes; Hancock's statements about various items of stolen property, which the court viewed as an effort to enlist Angelina in the destruction of evidence; and Hancock's statements to Angelina on November 22, 2017, when Hancock drove Bentz's SUV and left it in Logan Heights.

The court ruled other areas remained protected by the privilege and were not proper areas of inquiry by the district attorney: statements about moving the body using Bentz's hope chest; statements by Hancock expressing fear about whether he would be able to move the body; statements Hancock made about purchasing a new cell phone, the knife he used to stab Bentz,

---

4    During the second hearing, the parties and the court referred to a chart prepared by the district attorney that does not appear in the appellate record.

cleaning efforts he made in Bentz's apartment, and shovels used to bury the body; statements Hancock made to Angelina about sending texts to Bentz to make it look like he was not involved in the murder; and statements Hancock made to Angelina on the phone the night he buried the body, including about the depth of the grave, that coyotes were all around the area where he was in Campo, and Hancock's anxiousness about being in a car with Bentz's body.

The trial date was continued after this second hearing and the prosecution filed an additional motion in limine concerning the marital communication privilege that was opposed by Hancock. As a result, another hearing on the privilege issues took place before trial. At this third hearing, the court again carefully considered specific statements made by Angelina to investigators and at Hancock's preliminary hearing. The court made additional evidentiary determinations in line with its earlier rulings. The court ruled Hancock's statements to Angelina about driving Hancock home from dropping Bentz's car in Logan Heights, leaving Bentz's car in the Mira Mesa parking lot, and burying Bentz's ring in their backyard were admissible under the crime-fraud exception to the privilege.

The court excluded testimony about the couple spending Angelina's Christmas bonus and Hancock asking Angelina where to find tape the day after the murder, which the prosecutor argued was an attempt to involve Angelina in the disposal of the body. The court ruled that conversations about Hancock purchasing a new phone were protected. Likewise, statements Hancock made to Angelina about how he would move the body were not subject to the crime-fraud exception to the privilege, but his request for a ride to Walmart on November 21st was subject to the exception.

At trial, Angelina testified as expected by the parties. She told the jury that on November 22, 2017, the day before Thanksgiving, Hancock asked her

16

for assistance after the murder by telling her to purchase cardboard boxes. Hancock told her that some of the Christmas ornament boxes located in storage had broken and needed to be replaced. Angelina bought the boxes and some packing tape and gave them to Hancock that day. She never saw the boxes again. When Hancock eventually brought the ornaments home for Christmas, they were not in the new boxes. Angelina testified that Hancock told her he used the boxes to try and make one giant box "[t]o transport [Bentz's] body."

Angelina also testified about Hancock's requests for numerous rides in the days following the murder. On November 21, 2017, Hancock asked her for a ride to Walmart. Thanksgiving night, November 23, 2017, Hancock asked for a ride to drop off his friend's SUV in Logan Heights, and she gave him one. After dropping off the SUV, he got into Angelina's car with a plastic bag, abruptly demanded Angelina stop the car and then tossed the bag over a fence. Hancock then told Angelina that the SUV was Bentz's and the plastic bag contained his wallet. That night, Angelina drove Hancock to Walmart and they purchased groceries using Bentz's credit card. After that, Angelina drove Hancock to borrow her friend's SUV, which he used to move Bentz's body. On November 25, 2017, Hancock asked Angelina to drive him to Logan Heights, and then to meet him in Mira Mesa and drive him home from where he left Bentz's SUV for the second time.

Angelina also testified that Hancock asked her to help him move Bentz's body; she said that Hancock had difficultly moving it because he had a bad back. Angelina testified further about borrowing their friends' car on Thanksgiving evening. According to Angelina, Hancock told her that he had a job stocking a warehouse and needed a vehicle to get there. Angelina drove Hancock to pick up the friend's vehicle, she saw it at their house in the

17

following days and Hancock told her not to look in the vehicle because he had Christmas packages in it. Angelina also testified she helped Hancock detail the vehicle before returning it.

Angelina also testified that Hancock told her he brought certain items home from Bentz's apartment. When Hancock offered the items to her, she told him to get rid of them. Hancock also told Angelina he buried Bentz's ring in their backyard and Angelina told Hancock to dig it up and dispose of it.

## B

### *Legal Standards*

"California recognizes two marital privileges. First, a spouse may refuse to testify against the other spouse (spousal testimony privilege). (Evid. Code, § 970.) Second, a spouse may refuse to disclose or may prevent the other spouse from disclosing confidential communications between them during their marriage (marital communications privilege). (Evid. Code, § 980.)" (*People v. Sinohui* (2002) 28 Cal.4th 205, 208.) Section 980 states: "Subject to Section 912 and except as otherwise provided in this article, a spouse …, whether or not a party, has a privilege during the marital or domestic partnership relationship and afterwards to refuse to disclose, and to prevent another from disclosing, a communication if he or she claims the privilege and the communication was made in confidence between him or her and the other spouse while they were spouses."

As a general matter, the claimant of the confidential marital communication privilege has the burden to prove, by a preponderance of the evidence, the facts necessary to sustain the claim. (*People v. Von Villas* (1992) 11 Cal.App.4th 175, 221 (*Von Villas*).) "To make a marital communication ' "in confidence," one must intend nondisclosure [citations]

18

and have a reasonable expectation of privacy.' [Citation.]  Both factors must be shown before invocation of the marital privilege will be honored." (*Id.* at pp. 220–221.)  In addition, " 'the privilege applies only to oral or written verbal expression from one spouse to the other, and acts of the spouses committed in each other's presence do not constitute *communications* between them, within the meaning of the privilege for confidential marital communications.' " (*People v. Cleveland* (2004) 32 Cal.4th 704, 743.)

Critically here, under section 981, the marital communication privilege does not apply "if the communication was made, in whole or in part, to enable or aid anyone to commit or plan to commit a crime or a fraud." (§ 981.)  The exception "does not permit disclosure of communications that merely reveal a plan to commit a crime or fraud[.]" (*People v. Dorsey* (1975) 46 Cal.App.3d 706, 718 (*Dorsey*).)  Rather, disclosure is allowed only if "the communication is for the purpose of obtaining assistance in the commission of the crime or fraud or in furtherance thereof[.]" (*Ibid.*)  As with the application of the crime-fraud exception to other privileges, a communication can be in furtherance of the criminal conduct even if one spouse is not aware of the planned illegal activity.  (See *State Farm Fire & Casualty Co. v. Superior Court* (1997) 54 Cal.App.4th 625, 645 [Discussing application of the crime-fraud exception to the attorney-client privilege] (*State Farm*).)

"A communication between married persons is 'presumed to have been made in confidence and the opponent of the claim of privilege has the burden to establish that the communication was not confidential.' " (*Von Villas, supra,* 11 Cal.App.4th at p. 220; § 917.)  However, the marital communication privilege is waived if the holders of the privilege, without coercion, have "disclosed a significant part of the communication" or have "consented to disclosure made by anyone." (§ 912, subd. (a); see *Von Villas,* at p. 223

19

[marital communications privilege waived by couple "speaking very loudly to one another" in prison visiting area because they knew or should have known third parties were present].)  Because privileges "prevent the admission of relevant and otherwise admissible evidence," they "should be narrowly construed." (*People v. McGraw* (1983) 141 Cal.App.3d 618, 622.)

We review the trial court's ruling on the admissibility of evidence when the marital communications privilege has been asserted under an abuse of discretion standard.  (*People v. Mickey* (1991) 54 Cal.3d 612, 654.)  "The underlying determinations, of course, are scrutinized in accordance with their character as purely legal, purely factual, or mixed." (*Ibid.*)  In reviewing a factual finding to support the crime-fraud exception, this court " 'may not weigh the evidence, resolve conflicts in the evidence, or resolve conflicts in the inferences that can be drawn from the evidence.  If there is substantial evidence in favor of the finding, no matter how slight it may appear in comparison with the contradictory evidence, the finding must be affirmed.' " (*State Farm, supra*, 54 Cal.App.4th at p. 645, bolding omitted.)

C

*Analysis*

Hancock asserts the court erred by "admitting [his] statements to Angelina, i.e. about the boxes, asking for rides, needing help with the body, using the [friends'] car, that he was moving [Bentz's] car, the items missing from [Bentz]'s and the bags, because they did not come within the crime-fraud exception of Evidence Code section 981."  Hancock relies on *Dorsey, supra*, 46 Cal.App.3d 706 to argue that his statements remained privileged because they were not made for the purpose of obtaining assistance in the commission of a crime, but rather merely revealed his plans to commit crimes or crimes he had already committed.

In *Dorsey*, the defendant committed a series of burglaries and arsons over the course of three months. (*Dorsey, supra*, 46 Cal.App.3d at pp. 709–712.) As he went along, he told his wife about his crimes and showed her the locations where they had occurred. (*Ibid*.) At trial, the prosecutor elicited testimony from the wife about her husband's disclosures. (*Id*. at pp. 712–715.) The defense attorney did not assert a claim of marital communication privilege, and on appeal the defendant argued his counsel was ineffective for failing to raise an objection to the testimony on the grounds of privilege. (*Id*. at p. 715.) The Court of Appeal agreed and reversed the convictions on this basis. (*Id*. at p. 720.)

Unlike *Dorsey*, the testimony that Hancock complains was improperly admitted was not merely disclosure of the murder or intended crimes of destroying and concealing evidence. Rather, it concerned Hancock's efforts, many successful, to enlist Angelina in assisting him in the cover-up of the murder. In addition, some of the testimony Hancock challenges concerned Angelina's own observations of Hancock's behavior (like driving him to various locations and seeing him toss a plastic bag over a fence) or statements that were not made in confidence. As discussed, neither of these categories of testimony are protected by section 980.

Hancock argues his statement to Angelina that he was going to use the boxes she purchased to make one large box to transport Bentz's body "had nothing to do with enlisting Angelina in a crime[.]" This assertion is belied by Angelina's testimony and other circumstantial evidence, including the facts that Angelina never saw the boxes she purchased again and the family's Christmas ornaments were never put in them. Angelina stated that Hancock asked her to purchase the boxes, that she did, and that he later told her "that same night or the very next morning" he had intended "to use them to make

21

one giant box … to transport [Bentz]'s body." Although Angelina also stated that Hancock told her initially the boxes were for Christmas ornaments in their storage unit, the evidence sufficiently supported the trial court's determination that Hancock's purpose for requesting the boxes was to use them to transport the body.

This finding brought the statements Hancock made to Angelina about that purpose within section 981's crime-fraud exception to the marital communication privilege. (See *People v. Santos* (1972) 26 Cal.App.3d 397, 402–403 ["the privilege does not cover communications made to enable the other to commit a crime …, destruction or concealment of evidence being a crime"].) We also agree with the Attorney General that the fact that Angelina may have been unaware at first of the purpose for the boxes does not save the statements from disclosure. As the parties acknowledged in the trial court, the application of the crime-fraud exception turns on Hancock's intent and knowledge—not Angelina's. (See *State Farm, supra*, 54 Cal.App.4th at p. 645 [in determining if the crime-fraud exception is applicable, "it is the intent of the client upon which attention must be focused and not that of the lawyers"].)

Hancock next argues that Angelina's testimony concerning borrowing the car of her friends was protected by the marital communication privilege because "[a]sking to borrow the GMC did not mean he was asking for help to commit a crime." This assertion too is belied by the record before this court. The trial court reasonably concluded that Hancock asked Angelina to help him borrow the SUV in order to carry out his efforts to dispose of the body. This determination was supported by the timing of when the car was borrowed (the friends had offered to lend the vehicle the weekend before, but Hancock turned them down), when the car was returned, and the evidence

22

that it was thoroughly detailed with Angelina's assistance before it was returned. The fact that Hancock testified he borrowed the vehicle only so he could get to a warehouse job did not negate the evidence supporting the court's contrary finding. (See *State Farm, supra,* 54 Cal.App.4th at p. 645.)

Likewise, the statements Hancock made to Angelina requesting rides throughout the week of the murder were properly admitted under the crime-fraud exception to the marital communication privilege. The testimony in the trial court supported the court's finding that each time Hancock asked his wife to drive him—to Walmart the evening he killed Bentz to get a ride from Tori's boyfriend to Bentz's apartment, home from Logan Heights where Hancock first left Bentz's SUV on Thanksgiving, back to Logan Heights, and to Mira Mesa to leave Bentz's SUV unattended in a parking lot—was in service of his efforts to hide or destroy evidence of the murder. The statements he made to facilitate these rides were for "the purpose of obtaining assistance in the commission of the crime or fraud or in furtherance thereof." (Cal. Law Revision Com. com., 29B pt. 3A West's Ann. Evid. Code (2009 ed.) foll. § 981, p. 439.)

Finally, the evidence supported the trial court's determination that the statements Hancock made to Angelina concerning items that he took from Bentz's apartment were made in an effort to hide or destroy that evidence. Angelina testified that Hancock asked her if she wanted a chess set and china set that Hancock took from Bentz's apartment. He also asked her if her father would want a stamp collection he took from Bentz's apartment. These statements were not mere confessions, as in *Dorsey*, that he had stolen from Bentz. Rather, the statements were reasonably construed by the trial court as attempts by Hancock to obtain Angelina's assistance in hiding this evidence. Similarly, Angelina testified that when Hancock told her he had

23

buried Bentz's ring in their yard, she told him to dig it up and dispose of it elsewhere. This statement showed Angelina's involvement in covering up the crime and attempting to avoid her own liability, bringing the testimony into the crime-fraud exception to the marital communication privilege.

Further, we agree with the Attorney General that even if the court did err in allowing Angelina's testimony concerning the various statements made by Hancock, the error was not prejudicial. We review error in receiving evidence in violation of a privilege under the harmless error standard of *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Canfield* (1974) 12 Cal.3d 699, 707–708.) Under this standard, reversal is required only if it is reasonably probable a result more favorable to the appealing party would have been reached in absence of the error. (*Watson,* at p. 836.)

Here, the evidence supporting the jury's verdict of guilt, outside of the challenged statements made by Angelina, was overwhelming. Unlike *Dorsey*, where "the People's case was based almost entirely on the testimony of an accomplice and the testimony of Mrs. Dorsey," the statements Hancock challenges made up only a fraction of Angelina's total damning testimony. (*Dorsey, supra*, 46 Cal.App.3d at pp. 719–720.) The unchallenged testimony included her observations of Hancock's movements in the days after the murder, Hancock's panicked state the evening of November 21, 2017 and the next day, Hancock's incriminating statements to her on the telephone from jail, her observation of Hancock throwing a bag later found containing Bentz's wallet that Hancock removed from Bentz's car, and her observations of Hancock taking cleaning and other supplies from their home and wiping blood and hair from his leg. Further, the testimony of the other witnesses and the physical evidence gathered in the case, particularly the cell phone

and Facebook data, the purchases made by Hancock using Bentz's credit cards, and the DNA evidence, directly tied Hancock to the murder.

The trial court carefully and thoroughly examined the marital communication privilege with respect to each statement Hancock now challenges on appeal. In each case, sufficient evidence supported the court's determination that the crime-fraud exception to the privilege applied. Accordingly, we conclude there was no error. Further, even if we assume error, in this case it was harmless.

II

*Prosecutorial Misconduct*

Hancock next argues that the district attorney committed prosecutorial misconduct in violation of Hancock's right to a fair trial. Specifically, Hancock asserts the prosecutor's statements in his closing rebuttal argument about the defense's inability to provide evidence to support his testimony improperly shifted the burden of proof to him. Recognizing his trial counsel did not object to the challenged statements, Hancock also argues that this failure constituted ineffective assistance of counsel.

The Attorney General responds that Hancock forfeited this argument by his counsel's failure to object and, further, failing to object was not ineffective assistance because the prosecutor's statements were permissible. Alternatively, the Attorney General asserts that if the prosecutor's statements were improper, the record does not show defense counsel's failure to object was unreasonable. Finally, the Attorney General argues that if the statements were improper *and* Hancock's counsel was ineffective for failing to object, the errors were harmless.

# A

## *Additional Background*

Before closing arguments, the court instructed the jury that the prosecutor had to prove Hancock's guilt beyond a reasonable doubt. During his closing, Hancock's counsel emphasized to the jury that "the prosecutor has to convince you of each and every single ... word[ ] [in the murder jury instruction] beyond a reasonable doubt." Defense counsel then concluded his closing presentation by focusing heavily on the prosecution's burden of proof.

The prosecutor then began his rebuttal by explaining that if the circumstantial evidence pointed to two or more *reasonable* conclusions, the jury was duty bound to select the conclusion that pointed to innocence. The prosecutor then discussed what conclusions were reasonable in this case, telling the jury to reject conclusions drawn from circumstantial evidence that were unreasonable. He continued:

> "It is unreasonable to think that [Bentz's body] is anywhere but somewhere in Campo. You have no evidence. You have no credit card charges in Ixtapa. You have no Uber trip rides from somewhere. You don't have baggage claims. You don't have Campo receipts at Acorn Casino. You don't have Raul's testimony. You don't have DNA of someone else at [Bentz]'s apartment. You don't have anyone else's identification wrapped up in with [Bentz's] identification."

The prosecutor then briefly argued the evidence led to just one reasonable conclusion and ended his presentation by discussing the reasonable doubt standard. Hancock's counsel raised no objections.

# B

## *Legal Standards*

" '[T]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of

26

mind.  A more apt description of the transgression is prosecutorial error."
[Citation.]  Such error occurs, as a matter of state law, when a prosecutor
'engage[s] in deceptive or reprehensible tactics in order to persuade the trier
of fact to convict.'  [Citation.]  Federal constitutional error occurs only when
the prosecutor's actions 'comprise a pattern of conduct that is serious and
egregious, such that the trial is rendered so unfair that the resulting
conviction violates the defendant's right to due process of law.'  [Citation.]  'In
order to be entitled to relief under state law, defendant must show that the
challenged conduct raised a reasonable likelihood of a more favorable verdict.'
[Citation.]  Under federal law, relief is not available if 'the challenged conduct
was ... harmless beyond a reasonable doubt.' " (*People v. Daveggio and
Michaud* (2018) 4 Cal.5th 790, 853–854 (*Daveggio*).)

"Advocates are given significant leeway in discussing the legal and
factual merits of a case during argument.  [Citation.]  However, 'it is
improper for the prosecutor to misstate the law generally [citation], and
particularly to attempt to absolve the prosecution from its ... obligation to
overcome reasonable doubt on all elements [citation].'  [Citations.]  To
establish such error, bad faith on the prosecutor's part is not required."
(*People v. Centeno* (2014) 60 Cal.4th 659, 666–667 (*Centeno*).)

"When attacking the prosecutor's remarks to the jury, the defendant
must show that, '[i]n the context of the whole argument and the instructions'
[citation], there was 'a reasonable likelihood the jury understood or applied
the complained-of comments in an improper or erroneous manner.
[Citations.]  In conducting this inquiry, we "do not lightly infer" that the jury
drew the most damaging rather than the least damaging meaning from the
prosecutor's statements.' " (*Centeno, supra*, 60 Cal.4th at p. 667.)

27

In addition, "[a] claim of prosecutorial misconduct is ordinarily preserved for appeal only if the defendant made 'a timely and specific objection at trial' and requested an admonition. [Citations.] ' "The primary purpose of the requirement that a defendant object at trial to argument constituting prosecutorial misconduct is to give the trial court an opportunity, through admonition of the jury, to correct any error and mitigate any prejudice." [Citation.]' [Citation.] Consistent with that purpose, '[a] court will excuse a defendant's failure to object only if an objection would have been futile' [citation], or if an admonition would not have mitigated the harm caused by the misconduct [citations]. ' "[T]he absence of a request for a curative admonition' " may likewise be excused if ' " 'the court immediately overrules an objection to alleged prosecutorial misconduct [and as a consequence] the defendant has no opportunity to make such a request.' " ' [Citation.] 'A defendant claiming that one of these exceptions applies must find support for his or her claim in the record. [Citation.] The ritual incantation that an exception applies is not enough.' " (*Daveggio, supra*, 4 Cal.5th at p. 853.)

## C

### *Analysis*

As stated, Hancock's trial counsel did not object to the statements that he now claims constituted prosecutorial misconduct. He argues there was no forfeiture of the issue because such an objection would have called more attention to the prosecutor's statement, making the prejudice worse. However, Hancock does not explain why the objection could not have been raised outside the presence of the jury, which could have allowed the court to provide an admonishment to the jury to disregard the prosecutor's alleged misstatements before they began their deliberations. Accordingly, because

28

Hancock's counsel did not object to the statements that Hancock now asserts constituted prosecutorial misconduct, the issue is forfeited.

Even if the issue had been preserved for our review, however, we would conclude the prosecutor's comments did not constitute error.[5] As Hancock's brief states, a prosecutor "may comment on the defendant's failure to call logical and material witnesses." That is exactly what the prosecutor was doing by the statements in the rebuttal that Hancock challenges. (See *People v. Vargas* (1973) 9 Cal.3d 470, 475 ["It is now well established that although *Griffin*[ *v. California* (1965) 380 U.S. 609] prohibits reference to a defendant's failure to take the stand in his own defense, that rule 'does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses.' "]; and *People v. Woods* (2006) 146 Cal.App.4th 106, 112 ["Comments on the state of the evidence or on the defense's failure to call logical witnesses, introduce material evidence, or rebut the People's case are generally permissible."].)

The prosecutor did not suggest that Hancock had the burden to prove his innocence. Rather he argued the theory of the case presented by the defense was not a reasonable one because there was no physical evidence— "no credit card charges [by Bentz] in Ixtapa;" "no Uber trip rides" or "baggage claims" by Bentz; no receipts from the Acorn Casino; no evidence of Raul; no DNA of another perpetrator; and no evidence identifying anyone else "wrapped up with [Bentz]" —to support it. This was not prosecutorial error. (See *People v. Young* (2005) 34 Cal.4th 1149, 1195–1196 [Holding prosecutor's argument that there was no evidence to support innocence did not "cross the critical line" between permissible "comment[s] that a defendant has not

---

[5] For this reason, we need not reach Hancock's claim of ineffective assistance of counsel.

29

produced any evidence" and the impermissible suggestion "that 'a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence.' "].)  Further, directly after the challenged statements, the prosecutor referred back to the burden of proof, correctly explaining to the members of the jury that to convict "you have to have an abiding conviction in the proof that the defendant is guilty of murder."  Put simply, the prosecutor's comments on the lack of evidence to support Hancock's assertion of innocence did not constitute prosecutorial misconduct.

DISPOSITION

The judgment of conviction is affirmed.


McCONNELL, P. J.

WE CONCUR:


IRION, J.


GUERRERO, J.

30